IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs at Knoxville August 16, 2016

**STATE OF TENNESSEE v. RAWNEY JEAN TAYLOR[1]**

**Appeal from the Circuit Court for Montgomery County**
**No. CC15-CR-348      William R. Goodman, III, Judge**

_____

**No. M2015-02142-CCA-R3-CD – Filed May 16, 2017**

_____

A Montgomery County Circuit Court Jury convicted the Appellant, Rawney Jean Taylor, of initiating a false report, a Class D felony; criminally negligent homicide, a Class E felony; and reckless endangerment, a Class A misdemeanor, and the trial court sentenced her to three years, two years, and eleven months, twenty-nine days, respectively. The court ordered that she serve the three- and two-year sentences consecutively for a total effective sentence of five years. On appeal, the Appellant contends that her three- and two-year sentences are excessive, that the trial court erred by ordering consecutive sentencing, that the trial court erred by denying her request for judicial diversion, and that the trial court erred by denying her request for probation. Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Christopher G. Clark and Zachary L. Talbot, Clarksville, Tennessee, for the appellant, Rawney Jean Taylor.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Kimberly Lund and Daniel Stephenson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

_____

[1] The Appellant's first name is also spelled "Rawny" in the record. However, we have chosen to spell it as it appears in the indictment, "Rawney."

# I. Factual Background

This case relates to the death of the Appellant's four-year-old daughter, Arianna Taylor. In August 2013, the Montgomery County Grand Jury returned a ten-count indictment, charging the Appellant and her then-husband, DeMarkus Montreal Taylor (hereinafter "DMT"), with felony murder of the victim; aggravated child abuse of the victim, the victim's older sister, and the victim's younger brother; and initiating a false report. In February 2015, the grand jury returned a fourteen-count superseding indictment. The Appellant and DMT moved to sever the charges involving the victim from those involving their two other children.[2] In July 2015, the Appellant and DMT were tried jointly for the following crimes committed against the victim: aggravated child abuse by DMT; felony murder in the perpetration of aggravated child abuse by DMT; aggravated child neglect by DMT; felony murder in the perpetration of aggravated child neglect by DMT; aggravated child neglect by the Appellant; felony murder in the perpetration of aggravated child neglect by the Appellant; initiating a false report by DMT; and initiating a false report by the Appellant.

Although the Appellant does not contest the sufficiency of the evidence, we will summarize the evidence at trial as it is relevant to sentencing. Christopher Shoemaker testified that he was a volunteer firefighter with the Woodlawn Fire Department. On July 12, 2013, Shoemaker responded to a call that a child was not breathing. He arrived at a mobile home on Dotsonville Road less than five minutes later and was the first responder on the scene. As his truck approached the residence, DMT was running on a gravel driveway toward him. DMT led him inside, Shoemaker went into a back bedroom, and he saw the victim lying on a bed. A blanket was pulled up to her chin, and a pillow was behind her head. Shoemaker moved the blanket and checked the victim's carotid artery for a pulse. Finding no pulse, he "went to check her regular pulse" and noticed that her arm was stiff and cold. A small amount of blood was in her nostril and on the edge of her lip. Shoemaker told DMT that "there was nothing we could do." He did not see any other children or adults in the home. On cross-examination, Shoemaker testified that he arrived about 3:00 p.m. and that the victim's hair "was flowing up behind her head and laid on the pillow."

Jerry Buchanan testified that he was a volunteer firefighter with the Woodlawn Fire Department and the second responder on the scene. Christopher Shoemaker met him at the front door. Buchanan went inside and passed a man who was kneeling on the kitchen floor and appeared very distraught. As Buchanan entered the back bedroom, Shoemaker told him that the victim was cold to the touch and that rigor mortis had set in. Buchanan told Shoemaker they needed to exit the residence and not let anyone inside.

---

[2] The disposition of the Appellant's motion to sever is not in the record. However, according to the Appellant's brief, the motion was granted and the severed charges were ultimately dismissed.

- 2 -

Buchannan said that he did not see anyone else in the home but that he "heard them screaming and crying" in another bedroom.

Lieutenant Danny Cotterell of the Montgomery County Emergency Medical Services testified that he was a paramedic and deputy coroner for the Montgomery County Medical Examiner. On July 12, 2013, he responded to the scene for the purpose of initiating life saving measures on the victim. However, when he touched the victim, he found that she had rigor mortis, "which means that there is nothing we can do any longer to attempt to resuscitate."

Lieutenant Cotterell testified that he went into another bedroom and began questioning the Appellant for the coroner's report. The Appellant said "they" heard the victim snoring sometime the previous night. They checked on her, thought she was sleeping well, and left her alone. Lieutenant Cotterell also spoke with DMT. DMT told him that DMT had sent the victim to bed early the previous evening because she was "being bad." Sometime later, the victim started crying, came out of her room, and said her head hurt. DMT felt the victim's head but did not feel a bump, so he sent her back to bed.

Lieutenant Cotterell testified that he examined the victim for the coroner's report and saw bruising on the right side of her face, on her chin, and on both arms. He also saw a wound or bruise on her chest. He felt the victim's head and noticed a depressed area behind her right ear. On cross-examination, Lieutenant Cotterell acknowledged that the Appellant was crying and upset.

Officer Shanna Grice of the Montgomery County Sheriff's Office (MCSO) testified that on July 12, 2013, she responded to the scene of an unresponsive four-year-old child. When she arrived, first responders were exiting the mobile home and told her that "she's gone." Officer Grice said that she went to the back bedroom and that the victim "appeared [to be] in a position that was not very natural." The victim also had bruising on her left arm. Officer Grice secured the Appellant, DMT, and their two other children in another bedroom. DMT was calm and not very emotional, but the Appellant "was crying at different times." The Appellant and DMT were taken out of the room separately to speak with an investigator. Officer Grice said that as the Appellant and DMT were taken in and out of the bedroom, the Appellant became more and more upset and began hyperventilating. Officer Grice asked the Appellant if she needed medical attention or water, and the Appellant said she would calm herself down.

Michael Allen Mason testified that he lived in the same mobile home park as the Appellant and DMT, that he knew them and their children, and that he could see their home from his home. About 9:30 or 10:00 a.m. on July 12, 2013, Mason returned home

and saw the Appellant and DMT on their back steps. One seemed to be consoling the other. DMT was sitting down, and the Appellant was behind him with her hand on his shoulder. Mason said that "it seemed odd for them to be out there" and that they usually would wave to him. However, that day, "they looked over, almost in a way that they didn't want [him] to see them."

On cross-examination, Mason acknowledged that the Appellant looked upset and distraught and said that "they were both upset." Mason acknowledged giving an interview to police on July 17 in which he stated that DMT waved to him on July 12.

Investigator Jeff Morlock of the MCSO testified that on July 12, 2013, he took a statement from DMT in his patrol car. The statement was reduced to writing and signed by DMT. Investigator Morlock read the statement to the jury, saying as follows:

> "Yesterday, my kids started acting up, doing nasty things with each other. Then I had split them up by putting Ariana on her bed and my son on the couch with time out. After I walked out of the room, Ariana had come out and told me that she hit her head. So I felt her head for knots and there wasn't any. I told her to lay down and you will be okay. After that, we made some dinner for the kids. Ariana would not wake up but she was breathing and snoring. We just figured that she was tired, so by 11:30 or 12:00 we had made all the kids go to bed and Rawny and myself went into the room to give them all a kiss and Ariana was snoring and breathing good. So we checked on her again before we went to sleep and she was doing the same thing so we just figured she was tired. My wife woke up the next" and he started to write morning and he crossed it out and wrote "afternoon and checked on her and then she run back in the room with me and said she was cold and not breathing. I jumped out of the bed, ran into the room and shook her a little bit to try and wake her up. She didn't get up and then I called."

On cross-examination, Investigator Morlock testified that DMT sat in the front seat of his patrol car and gave the statement voluntarily.

Joshua Wall testified that on July 12, 2013, he was an investigator for the MCSO, responded to the victim's home about 4:30 p.m., and photographed the scene. The victim was still lying in bed, and two other beds were in the room. The victim had injuries on her arms.

Investigator Mark Wojnarek of the MCSO testified that he interviewed DMT at the sheriff's office but that he could not remember when the interview occurred. The recorded interview was played for the jury. During the interview, DMT said that the Appellant went to work on July 11, 2013, and that he looked after the children. The victim and her brother were doing "nasty stuff" to each other, so he separated them by putting his son on the couch and the victim in bed. The victim later complained that she had hit her head, so DMT went to her room and rubbed her head. The victim was "alright" and lay back down. When the Appellant got home from work, she and DMT checked on the victim. The victim was sleeping, snoring, and would not wake, but DMT was not concerned because he thought she was tired. The other children went to bed about 10:00 p.m. The next day, DMT and the Appellant woke about 1:00 or 2:00 p.m. Their other children got up about the same time. The Appellant went to check on the victim and screamed that the victim was not moving. DMT checked on the victim and telephoned 911 about thirty seconds later. He said he did not know how she died and was "waiting on the autopsy." He stated that the victim had a shunt in the right side of her head and that he was hoping the victim's hitting her head did not cause her shunt to "crinkle." He said "nobody went crazy like that and beat" the victim.

Norman Ray Clark, III, testified that he was the custodian of records for Sprint and identified records for a cellular telephone account in the Appellant's name. According to the records, the Appellant's telephone received a call at 10:32 a.m. on July 12, 2013. The call was answered by voicemail. The telephone received a second call at 10:35 a.m., and someone answered the call. The Appellant's telephone received a third call at 1:30 p.m., but the call was answered by voicemail. Someone used the telephone to call 911 at 2:54 p.m.

Investigator Julie Webb of the MCSO testified that she went to the victim's home on July 12, 2013. She went into the back bedroom and saw the victim lying on a bed. The victim had what appeared to be bruising on her left arm and a lot of discoloration on her face. Blood was around her nostril, and her mouth had blood on it and "what appeared to be like teeth marks." Investigator Webb spoke with the Appellant, and the Appellant told her the following: The Appellant went to work about 9:30 a.m. on July 11. When she left, DMT and the children were sleeping. The Appellant got home about 7:30 p.m. The victim was in bed, and her brother was on the couch. The Appellant tried to wake the victim for dinner, but the victim was "snoring loudly," which was unusual. At some point, the Appellant put her two other children to bed. About midnight, she checked on the victim, and the victim was still snoring loudly. The Appellant kissed the victim and went to sleep. The family woke up the next afternoon. The Appellant's two other children came in for breakfast, but the victim was not with them. The Appellant went to check on the victim and found her cold and unresponsive. The Appellant ran

down the hall, screaming for DMT.

Investigator Webb testified that she interviewed the Appellant three additional times on August 6. During the Appellant's first interview, she admitted that she and DMT had not been truthful about discovering the victim and that she got up in time for work on July 12. The victim was cold, and the Appellant started screaming. DMT came into the bedroom, and they tried to wake the victim. However, the victim was stiff. The Appellant was afraid to call 911, so she and DMT decided "not to do that at that time." The Appellant denied seeing marks on the victim's face and never claimed that DMT stopped or prevented her from calling 911.

On cross-examination, Investigator Webb testified that the Appellant said she spoke with DMT about the victim on the night of July 11 and that he assured her "everything was fine." When Investigator Webb went into the victim's bedroom on July 12, the victim's bruises immediately "stuck out" to the officer. She said that the lighting in the bedroom was dim but that the lighting was probably better than it was at night. Investigator Webb stated that the Appellant was charged with the same offenses as DMT "because she had a child that wouldn't wake up and she talked about multiple times trying to wake her up, she wouldn't wake up, and this child had multiple injuries at that time." Investigator Webb acknowledged that there was no proof the Appellant saw the victim's injures on July 11 and that the Appellant was crying and emotional on July 12.

Investigator Webb testified that during her second interview with the Appellant on August 6, she told the Appellant that she knew DMT had beat the victim to death but that DMT would not admit it. During Investigator Webb's final interview with the Appellant, the Appellant was sobbing. The Appellant's story about what happened on July 11 remained consistent. Her story about waking up and finding the victim stiff on July 12 also remained consistent. On redirect examination, Investigator Webb testified that the Appellant was awake about five hours before she and DMT called 911.

MT testified that she was eight years old and the victim's older sister. She said that she saw "[t]hem hurting [the victim] in the bathroom" and that the victim was "getting beatings" while MT was in her bedroom. Afterward, MT saw the victim in the victim's bed. MT said that the last time she saw the victim, the victim was "all blue and her teeth were blue and stuff." MT tried to wake the victim but was unable to do so. She told her parents about the victim, they "came in there," and they returned to their bedroom. They did not call a doctor right away.

The State asked MT, "[H]ow was [the victim] getting beat?" MT answered, "With his hand sometimes" and "[s]ometimes a belt." MT said the victim "didn't want to get hit, so she said I don't want to get a spanking, she kept talking." MT stated that the

Appellant was at work during the beating and that the victim was in bed when the Appellant came home.

On cross-examination, MT acknowledged that she had talked with a lot of people about what happened to the victim. She said that she did not hear the victim snoring and that the victim "looked scary" on July 12 because the victim's lips were blue. The State asked if the victim looked scary the previous night, and MT said, "No, I don't think so." She acknowledged that the Appellant was at work when the victim "got this . . . whipping" and said that the Appellant did not whip the victim "at that time."

Adele Lewis of the Davidson County Medical Examiner's Office testified as an expert in forensic pathology that she performed the victim's autopsy on July 13, 2013. Dr. Lewis listed the injuries on the outside of the victim's head as follows: bruising on and behind her right ear, which frequently occurred when someone "boxe[d]" a child's ear; a black bruise on her right cheek; a brownish-yellow bruise on her left cheek; two black bruises on her left jaw "with some scrapes on the tops of those"; a scrape under her chin; and several pinpoint hemorrhages on the left side of her neck that were indicative of someone grabbing her around the neck or striking her on the neck. Dr. Lewis listed the injuries to the inside of the victim's head as follows: bruises and scalp bruises on both sides of the top of her head, a deep scalp bruise on the back of her head, bleeding under the covering of her brain between the skull and the brain, bleeding on the right side of her brain and on the underside of her brain, bruising and bleeding inside the back of her neck where the spinal cord connected to the head, and bleeding on the spinal cord itself. Dr. Lewis described the spinal cord injury as "a whiplash type injury" caused by a "very violent force." The victim had a shunt in the right side of her head that drained fluid from her brain into her abdomen. Dr. Lewis found a small amount of blood in the victim's abdomen and, therefore, concluded that the victim's shunt was still functioning.

Dr. Lewis testified that instead of the victim's brain being "a nice little pink/tan color," which was normal, it was "red and bloody and had blood clots on it." The victim's head injuries indicated that she had been shaken and that her head had either hit an object or that an object had hit her head. Dr. Lewis also said the victim's head injuries were "[what] I would expect to see in someone who has been in a major car crash or who had fallen two or three stories out of a building." The victim's brain was very swollen, and she had bleeding inside the backs of her eyes, indicative of child abuse.

Dr. Lewis testified as to various bruises and scrapes that she found on the victim's chest, abdomen, back, and arms. The bruises were of various sizes and colors. She said that a round scrape on the victim's chest was consistent with a cigarette burn or "could be just a scrape." Dr. Lewis found bleeding into the fat underneath the skin near the victim's left hip. A handprint, two brown bruises, and two yellow bruises were on the

victim's right buttock, and she had two yellow-brown bruises on her left buttock. Dr. Lewis said the bruises with yellow discoloration were at least forty-eight hours old. One of the victim's right ribs "had a healing fracture but also had a fresh or acute fracture through that healing portion of the rib." The victim also had bleeding in her right eye that was usually associated with violent shaking.

Dr. Lewis testified that the victim's cause of death was multiple blunt force injuries and that her manner of death was homicide. She classified the circumstances of the victim's death as battered child syndrome based on the multiple injuries of different ages and the victim's medical history. She stated that the snoring reported by the Appellant and DMT may have been "agonal breathing," which was "the way someone breathes right before they die." She said that agonal breathing sounded like "someone gasping or breathing irregularly," that "it does sound like snoring but it is much heavier, deeper snoring and again, not like regular breathing," and that agonal breathing could not be easily mistaken for snoring. If the victim was experiencing agonal breathing, she would have been unconscious and in no pain. The victim "possibl[y]" could have survived if she had received medical attention while she was having agonal breathing. In addition to agonal breathing, the victim's head injury could have caused her inability to waken, vomiting, and her eyes to point in different directions. Dr. Lewis stated, "There are all sorts of manifestations of that but it would be clear that something was very wrong with the child."

Dr. Lewis testified that the victim also had a mild and very early case of pneumonia. The pneumonia could have developed within six to ten hours of her brain injury and "may be reflective of someone not being fully alert for a while." Dr. Lewis said that the victim's head injuries and brain swelling caused her death, that the injuries could have occurred during a single event, and that there was no medical or natural explanation for the injuries. At the conclusion of Dr. Lewis's testimony, the State rested its case.

Twenty-nine-year-old DMT testified in his own behalf that on July 11, 2013, he was at home with MT, the victim, and their brother while the Appellant was at work. At some point, MT told him that the victim and their brother were misbehaving. DMT put the victim in her brother's bed and her brother on the couch. About five minutes later, the victim was crying, said she had hurt her head, and put her hand on the right side of her head. DMT rubbed her head and checked it for knots but did not find anything. He told her to lie back down.

DMT testified that the Appellant came home about 7:00 p.m. and made dinner for the children. The victim did not get up to eat, was asleep in her brother's bed, and was snoring. DMT and the Appellant later checked on the victim, and the victim was still

sleeping and breathing normally. They put the two other children to bed about 10:00 p.m. The Appellant checked on the victim about midnight.

DMT testified that the Appellant woke him about 11:00 a.m. the next day. She was crying and screaming and told him that the victim was cold and stiff. DMT acknowledged that he did not call 911 until 2:54 p.m. and said that he did not call right away because he was "sick" and not thinking clearly. The Appellant was in shock and crying. DMT denied making any other telephone calls or going outside prior to calling 911. He acknowledged that he lied to the police and said that he did so because he was "a nervous wreck" and did not want the police to take away his other children. He denied beating the victim.

On cross-examination, DMT testified that when he and the Appellant found the victim deceased, the Appellant covered her with a blanket. The State showed him photographs of the victim lying in bed on July 12, and he said the victim did not have any injuries on the night of July 11. He stated that "[n]obody done that" to the victim and that "[she] was like that when we found her." He said that he did not whip the children on July 11 and that he "didn't see anybody do it." He said he never told the Appellant not to call 911.

Joyce Blount testified for the Appellant that she and the Appellant worked at Rooms for Less on July 11, 2013. Their shift was 10:00 a.m. to 7:00 p.m.

The twenty-eight-year-old Appellant testified that she went to work on July 11, 2013, and that she got home about 7:30 p.m. The victim was in her brother's bed, her brother was on the couch, and MT was in the kitchen. The Appellant made dinner for the children and called them to eat, but the victim did not wake and was snoring. The Appellant asked DMT if the victim was okay. He said yes and that she was probably tired. It was still light outside, but the curtains on the windows blocked out the light in the bedroom, and the Appellant saw nothing concerning. At some point, the Appellant checked on the victim, and the victim was still snoring. MT was also in the bedroom and was watching a movie. A blanket was covering the victim, and the Appellant did not see any marks on the victim's face.

The Appellant testified that the next day, she got up about 9:00 a.m. because she was supposed to be at work at 10:00 a.m. She saw the victim lying in bed and noticed that the victim was in the same position as the previous night. She touched the victim, and the victim was cold. The Appellant ran back to her bedroom and told DMT. They went into the children's room and checked on the victim. They found her cold and took the two other children out of the room. The Appellant said that she asked DMT what had happened to the victim and that he kept saying he did not know. The Appellant told him

that they had to call the police, but "he was like we are not calling the police right now because there were things he had to hide." DMT found the Appellant's cellular telephone and would not let her call law enforcement.

The Appellant testified that she knew the victim "was gone" and that she had to protect herself and her other children. Eventually, DMT telephoned the police. The Appellant acknowledged lying to Investigator Webb about what time she found the victim and said that she was following the story DMT "set up." She said she was in fear of him but finally told the truth on August 6. Sometime prior to the victim's cremation on July 20, DMT told the Appellant that "I just hope this didn't happen when I threw her on the bed and she hit her head." The Appellant told Investigator Webb about DMT's statement. She later divorced DMT.

On cross-examination, the Appellant testified that she last saw the victim alive on the night of July 10. She gave the victim a bath, and she did not see any bruises on the victim. On July 11, the Appellant questioned DMT about why the victim was in bed, and he told her that the victim "got in trouble and he had told her to go lay down." The Appellant checked on the victim about midnight and gave her a kiss. A blanket was already pulled up to her neck, and the Appellant was unaware of any marks on the victim's body. The victim did have a small mark on her chin, but DMT had told the Appellant two days earlier that the victim had fallen. The Appellant did not see any blood in the victim's nose. She acknowledged that the victim was beaten to death. However, she said that if she had thought the victim needed help, she would have obtained it for the victim. She said DMT was abusive to her for years.

The Appellant testified that DMT would not let her call 911 on July 12. She acknowledged that when she spoke with Investigator Webb that day, she did not tell the investigator that she was in fear of DMT. After the victim's death, the Appellant, DMT, and the children stayed at DMT's mother's house because they did not want to go home. The Appellant said she also knew DMT "wasn't going to do things to me as often than when we were living alone."

On redirect examination, the Appellant acknowledged that she was not trying to protect DMT. She also acknowledged that she was not saying DMT did not beat the victim.

The jury convicted DMT as charged of aggravated child abuse, felony murder in the perpetration of aggravated child abuse, aggravated child neglect, felony murder in the perpetration of aggravated child neglect, and initiating a false report. The jury convicted

the Appellant of initiating a false report as charged; criminally negligent homicide[3] as a lesser-included offense of felony murder committed during the perpetration of aggravated child neglect; and reckless endangerment[4] as a lesser-included offense of aggravated child neglect.

At the Appellant's sentencing hearing, Linda Alvarez, the Appellant's mother, testified that the Appellant was "a very happy go lucky kid," that the Appellant was "always an A and B student," and that she never had any disciplinary problems with the Appellant. When the Appellant became an adult, she and Alvarez had a close relationship. Alvarez was blind in both eyes for a time, and the Appellant took care of her. Alvarez never saw the Appellant spank her children and never had any concerns about the Appellant's ability to parent. She said that the Appellant was scared of DMT and that she bought a mobile home for the Appellant so that the Appellant and the children would have a place to go when the Appellant divorced him. After the Appellant was released on bail, she lived with Alvarez, continued to work at Rooms for Less, and was home every night. Alvarez said she did not think the Appellant would get into additional trouble.

On cross-examination, Alvarez testified that the Appellant had not lived with her for about nine months and was currently living with a boyfriend, who was a cook for Ruby Tuesday. The Appellant's boyfriend had been "in trouble before" and was on parole. Alvarez acknowledged that DMT lived with the Appellant in the mobile home Alvarez bought for the Appellant but said they lived there only six weeks. Alvarez said the Appellant "was helping me pay on the trailer so that she would have a place to stay

---

[3] Criminally negligent homicide is defined as "[c]riminally negligent conduct that results in death[.]" Tenn. Code Ann. § 39-13-212(b).

> "Criminal negligence" refers to a person who acts with criminal negligence with respect to the circumstances surrounding that person's conduct or the result of that conduct when the person ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-106(a)(4). "In other words, the accused must know, or should know, that his or her conduct, or the result of that conduct, will imperil the life of another given the circumstances that exist when the conduct takes place." State v. Adams, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995).

[4] Misdemeanor reckless endangerment occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." Tenn. Code Ann. § 39-13-103(a).

when she filed for divorce."

Teresa Burkhart testified that she was the Regional Manager for Rooms for Less and that she hired the Appellant in July 2013. She said the Appellant "was and is" a great employee, that the Appellant was very responsible, and that the Appellant "did her job well." After the Appellant was arrested and released from jail, she continued to work at Rooms for Less. The Appellant was a "key holder" to one of the stores and was responsible for opening and closing the store with another employee on Sundays. Burkhart said that if the trial court granted alternative sentencing, the Appellant could continue to work at Rooms for Less.

On cross-examination, Burkhart testified that she knew the Appellant had been fired from Furniture Connection and that the Appellant told her the firing had "[s]omething to do with missing money." She said that the Appellant never mentioned being scared of DMT but that "we didn't discuss a whole lot of our personal lives."

The State introduced the Appellant's presentence report into evidence. In the report, the Appellant stated that she dropped out of high school in the tenth grade but obtained her GED. She described her physical and mental health as excellent, said that she first used alcohol when she was twenty-one years old, and said that she smoked marijuana at sixteen but stopped at nineteen. In addition to the Appellant's employment at Rooms for Less, the report showed that the Appellant worked for Convergys from January 2005 to June 2007 and Furniture Connection from June 2007 until she was fired in December 2012. According to the report, the Appellant had no prior criminal record.

The State also introduced into evidence a letter written by MT. The trial court read the letter aloud as follows:

> Dear birth Mom, sometime you are mean. You laughed when we got whipped and that was not nice. You also did not feed us sometime and that made me feel sad. You did not keep us safe. You did not protect us from your husband and you let him kill Ariana. That makes me and [my brother] better than you. I wish you would have been a better person. Why do you like bad guys? I thought you are scared of bad guys? Good bye forever, [MT]. P.S. I crumpled this up to show I am very mad.

At the conclusion of the testimony, the trial court noted that the Appellant had requested judicial diversion and probation and stated:

The law encourages the Court to consider alternatives other than incarceration. Diversion is discretionary with the Trial Court. There has to be a showing of amenability to correction and case law - the Statute indicates that the facts and circumstances surrounding the offense, nature and circumstances of the criminal conduct involved. Whether or not a sentence of - whether or not a sentence for probation would unduly depreciate the seriousness of the offense. Whether or not confinement is particularly suited to provide an effective deterrent to others likely to commit similar offenses and the list goes on.

I recall the testimony in this case . . . . I was thinking at the time that this was a lot of sleeping for a little child to do. And then they went in the next morning and Ariana was cold. Then there was a delay - the best I remember, almost - depending on the time line, they said if I recall, they slept late, they got up and it was time, almost three hours before the 911 call and one witness - one neighbor in the trailer park in which they lived, testified that he had forgotten something and went back home and was sitting out on the deck during this period of time when he went back home to pick up whatever it was that he had forgotten and that this was before there was a call placed to 911.

I do not find this to be a suitable case for diversion. Your request for diversion is denied. We look next to the considerations as it relates to probation. That nature of the conduct here in that you would have a mother that would come home from work and you have a child that she cannot awaken and has no supper, the child never awakes and actually what it was, the agonal breathing is called, what we call the "death rattle", what the snoring was. And did nothing. We get up the next morning and then we have to think about whether we are going to call 911 or not? I do not find this to be a suitable case for probation. The request for probation is denied.

The court applied enhancement factors (4), that the victim of the offense was particularly vulnerable because of her age, and (5), that the Appellant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense.

- 13 -

See Tenn. Code Ann. § 40-35-114(4), (5). The court found no mitigating factors applicable and sentenced the Appellant to three years for initiating a false report, a Class D felony, two years for criminally negligent homicide, a Class E felony, and eleven months, twenty-nine days for reckless endangerment, a Class A misdemeanor. See Tenn. Code Ann. §§ 40-35-111(e)(1), -112(a)(4), (5). The court ordered that the Appellant serve the misdemeanor sentence concurrently with the two-year sentence and that she serve the two- and three-year sentences consecutively based upon her being a dangerous offender for a total effective sentence of five years.

## II. Analysis

The Appellant contends that her three- and two-year sentences are excessive, that the trial court erred by ordering consecutive sentencing, that the trial court erred by denying her request for judicial diversion, and that the trial court erred by denying her request for probation. The State argues that the trial court properly sentenced the Appellant and properly denied her requests for judicial diversion and probation. We agree with the State.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court is to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In sentencing a defendant, the trial court shall consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in her own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the Appellant to demonstrate the impropriety of her sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of
> punishment is the sentence that should be imposed, because

the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in § 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

## A. Length of Sentences

The Appellant contends that the trial court erred by imposing three- and two-year sentences for her felony convictions because the trial court should have applied mitigating factors and misapplied enhancement factors. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

Before sentencing, the Appellant filed a written request for consideration of the following mitigating factors: (2), that "[t]he defendant acted under strong provocation"; (3), that "[s]ubstantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense"; (4), that "[t]he defendant played a minor role in the commission of the offense"; (11), that "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct"; and (12) that "[t]he defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime." Tenn. Code Ann. § 40-35-113(2), (3), (4), (11), (12). In announcing the length of the Appellant's sentences, the trial court noted the mitigating factors set out in the

Appellant's memorandum and stated as follows:

> I remember when I heard this case, it bothered me having some background with agriculture, if you have worked cows or for that matter, pigs. You don't want to have [cows] around when you are doing things to a calf that is going to make the calf start whining or screaming and the same is true with pigs, because it makes the mama go nuts. We have in this instance, apparently a mother that was not concerned or did not distribute - or did not display concern when a child obviously was suffering from agonal breathing, and we don't know whether that would have save the child or not?
>
> I do not find that grounds exist to justify the defendant's conduct and so far as the charge, the jury found her guilty of reckless endangerment and criminally negligent homicide, a Class E felony. So far as criminal negligence is concerned, I cannot accept the contention that the defendant played a minor role. I just do not find that there are any mitigating factors that apply.

The Appellant claims that the trial court should have applied mitigating factor (2) to her sentence for initiating a false report and mitigating factors (3), (4), (11), and (12) to her sentence for criminally negligent homicide. Moreover, she contends for the first time that the court should have applied mitigating factor (1), that "[t]he defendant's conduct neither caused nor threatened serious bodily injury," to her sentence for initiating a false report and factor (13), the catch-all provision, to her sentence for criminally negligent homicide due to her lack of a criminal history and strong work history. Tenn. Code Ann. § 40-35-113(1), (13).

The evidence at trial established that the fatal beating administered to the victim occurred while the Appellant was at work. Nevertheless, when the Appellant came home from work at 7:30 p.m., the victim would not wake and was experiencing agonal breathing. The Appellant checked on the victim again at midnight, and the victim's condition had not changed. Yet, other than asking DMT if the victim was "okay," the Appellant did nothing to help the victim and did not check on her again until the next morning. By that time, the victim was dead. The trial court aptly concluded that cows and pigs showed more concern for their offspring than the Appellant. Although the Appellant testified that DMT would not allow her to call 911 and that she was afraid of him, she lied to officers when they arrived on the scene and continued to lie until August 6 when she finally told Investigator Webb that she found the victim deceased on the

morning of July 12.  Michael Mason testified that he saw the Appellant and DMT on their back steps about 10:00 a.m., that one appeared to be consoling the other, and that the Appellant had her hand on DMT's shoulder.  The Appellant also continued to live with DMT after the victim's death.  In MT's letter, she said that the Appellant laughed during previous whippings by DMT.  Thus, we conclude that the trial court did not did not abuse its discretion by refusing to apply the mitigating factors listed in the Appellant's memorandum.

As to the Appellant's claim that the court should have applied factor (1), that her conduct neither caused nor threatened serious bodily injury, to her sentence for initiating a false report, the Appellant failed to make that argument at sentencing.  See Tenn. R. App. P. 36(b).  As to her lack of a prior criminal history, a trial court may consider the absence of a prior criminal record as a mitigating factor but is not required to do so.  State v. Williams, 920 S.W.2d 247, 261 (Tenn. Crim. App. 1995).  Regarding her claim that she had a strong work history, this court has held that employment history should be considered favorably in sentencing.  State v. Kelley, 34 S.W.3d 471, 482-83 (Tenn. Crim. App. 2000).  However, Furniture Connection fired the Appellant after allegations of "missing money."  Thus, even if the trial court erred by failing to apply that factor, it was not entitled to great weight.

The Appellant contends that the trial court should not have applied enhancement factor (5), that she allowed the victim to be treated with exceptional cruelty, to her sentence for criminally negligent homicide.  We disagree.  The four-year-old victim lay severely injured and dying for hours, and the Appellant did nothing.  As to her claim that factors (4), that the victim was particularly vulnerable due to her age, and (5) were a "poor fit" for the offense of initiating a false report, we agree.   However, even if the court misapplied those enhancement factors, the record demonstrates that the court imposed the sentences "in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act."  Carter, 254 S.W.3d at 346.  The Appellant chose to protect herself and DMT by lying to the police.  Thus, we conclude that the court did not abuse its discretion by enhancing the Appellant's sentence from two to three years, the midpoint punishment in the range, for initiating a false report and from one to two years, the maximum punishment in the range, for criminally negligent homicide.

## B.  Consecutive Sentencing

The Appellant contends that the trial court erred by ordering that she serve her three and two-year sentences consecutively based upon her being a dangerous offender.  The State argues that the court properly ordered consecutive sentencing.  We agree with the State.

"Whether sentences are to be served concurrently or consecutively is a matter addressed to the sound discretion of the trial court." State v. Adams, 973 S.W.2d 224, 230-31 (Tenn. Crim. App. 1997). Tennessee Code Annotated section 40-35-115(b) contains the discretionary criteria for imposing consecutive sentencing. See also State v. Wilkerson, 905 S.W.2d 933, 936 (Tenn. 1995). Because the criteria for determining consecutive sentencing "are stated in the alternative[,] . . . only one [criterion] need exist to support the appropriateness of consecutive sentencing." State v. Mickens, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003).

In this case, the trial court imposed consecutive sentencing upon finding that the Appellant was "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(5). Our case law clearly reflects that in order to impose consecutive sentencing based upon finding that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and [that] (2) 'the terms are reasonably related to the severity of the offenses.'" State v. Moore, 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting Wilkerson, 905 S.W.2d at 938); see also State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). "Where . . . the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority" and can either conduct a de novo review to determine if an adequate basis exists for consecutive sentences or remand the case to the trial court for consideration of the requisite Wilkerson factors. Pollard, 432 S.W.3d at 864-65.

In ordering consecutive sentencing in this case, the trial court simply stated, "I get back to the thing that even farm animals have a high[er] regard for their offspring than what was exhibited in this case. Therefore, I order that the count for giving a false report will run consecutive." The court failed to make specific findings regarding the Wilkerson factors. Nevertheless, we conclude that the record establishes an adequate basis for imposing consecutive sentences. First, we have no hesitation in concluding that the five-year sentence reasonably relates to the severity of the crimes. In considering whether the sentence is necessary for the protection of the public from further crimes by the Appellant, the evidence at trial and sentencing established that this was not the first time the victim had been physically abused and strongly suggests that the Appellant participated in prior abuse of the victim. At the very least, she knew DMT was abusing the victim and should have been aware of the severity of the victim's condition on the night of July 11. She then did nothing to help the victim and continued to protect DMT by lying to the police. We note than in State v. Dorantes, 331 S.W.3d 370, 376 (Tenn.

2001), the young victim also suffered from battered child syndrome.  In upholding the trial court's imposition of consecutive sentencing for felony murder by aggravated child abuse and aggravated child abuse, our supreme court found that the dangerous offender classification was satisfied when "the defendant, at a minimum, demonstrated extreme callousness toward the health and welfare of the victim, and the results were fatal."  331 S.W.3d at 392.  Such is the situation in this case.  Accordingly, the trial court's imposition of consecutive sentencing is affirmed.

## C.  Judicial Diversion

The Appellant contends that the trial court erred by denying her request for judicial diversion.  The State argues that the trial court properly refused to grant the Appellant's request.  We agree with the State.

Pursuant to Tennessee Code Annotated section 40-35-313(a)(1)(B)(i), a defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony; has not previously been convicted of a felony or a Class A misdemeanor; and is not seeking deferral for a sexual offense.  Additionally, in determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors:  (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, (6) the deterrence value to the defendant and others, and (7) whether judicial diversion will serve the interest of the public as well as the defendant.  State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)).  The record must reflect that the trial court has taken all of the factors into consideration, and "we may not revisit the issue if the record contains any substantial evidence supporting the trial court's decision."  Id.  Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others."  Id.  When reviewing a trial court's decision to grant or deny judicial diversion, the standard of review is abuse of discretion with a presumption of reasonableness.  State v. King, 432 S.W.3d 316, 327 (Tenn. 2014).  This means that we "must . . . uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision."  Id.

Turning to the instant case, the trial court's comments regarding judicial diversion were inadequate to satisfy the Parker and Electroplating factors.  Accordingly, as with consecutive sentencing, the standard of abuse of discretion with a presumption of reasonableness does not apply, and we may conduct a de novo review or remand the issue

for reconsideration. See King, 432 S.W.3d at 327-28. We believe the record is sufficient for de novo review.

The parties do not dispute that the Appellant qualifies as a candidate for judicial diversion. Therefore, we turn to the factors in Parker and Electroplating.

First, as to the Appellant's amenability to correction, the Appellant lied to the police about the victim's death, and she continued to lie to them for weeks. She has expressed no remorse for the crimes. Thus, her amenability to correction weighs against granting judicial diversion. Second, the circumstances of the offenses were appalling and weigh heavily against granting judicial diversion. The third and fifth factors regarding the Appellant's criminal record and physical and mental health weigh in favor of granting judicial diversion. As to the fourth factor, the Appellant's social history, the Appellant dropped out of high school in the tenth grade. Although she claimed that she obtained her GED, the presentence report states that she did not verify that claim. At the time of the sentencing hearing, the Appellant's two surviving children had been taken away from her, and she was living with a man on parole. The Appellant has a consistent employment history but was fired from one job, and she stated in her presentence report that she smoked marijuana from sixteen to nineteen years old. Thus, we conclude that the Appellant's social history does not support granting judicial diversion. Finally, factors six and seven, the deterrence value to the defendant and others and whether judicial diversion will serve the interest of the public as well as the Appellant, weigh heavily against granting diversion. Thus, we conclude that judicial diversion is inappropriate in this case.

## D. Probation

Finally, the Appellant contends that the trial court erred by denying her request for probation. The State argues that the court properly denied probation. We agree with the State.

An appellant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. See Tenn. Code Ann. § 40-35-303(a). The Appellant's sentences meet this requirement. Moreover, an appellant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. See Tenn. Code Ann. § 40-35-102(6). Tennessee Code Annotated section 40-35-103(1) sets forth the following sentencing considerations which are utilized in determining the appropriateness of alternative sentencing:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

See also State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996). Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

The trial court's comments regarding the facts of this case demonstrate that it believed confinement was necessary to avoid depreciating the seriousness of the offenses. In denying alternative sentencing on that basis, the criminal act should be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree. Zeolia, 928 S.W.2d at 462. The circumstances here are indeed shocking and reprehensible. Thus, we conclude that the trial court did not abuse its discretion by denying alterantive sentencing.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE

- 21 -